IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONNA KAY BUSCH, in her : 
individual capacity and as the : 
parent and next friend of Wesley : 
Busch, a minor, : 
                         :       CIVIL ACTION
       v. : 
                         :       NO. 05-CV-2094
MARPLE NEWTOWN SCHOOL : 
DISTRICT, ET AL. : 

**SURRICK, J.**                                                    **MAY 31, 2007**

## <u>MEMORANDUM & ORDER</u>

Presently before the Court are Plaintiff Donna Kay Busch's Motion For Partial Summary Judgment (Doc. No. 20) and Defendants Marple Newtown School District, Marple Newtown School District Board of Directors, Robert Mesaros, and Thomas Cook's Cross-Motion For Summary Judgment (Doc. No. 19). For the following reasons, Defendants' Motion will be granted and Plaintiff's Motion will be denied.

## I.      BACKGROUND

Donna Kay Busch (hereinafter "Plaintiff") is the mother of Wesley Busch (hereinafter "Wesley"), a student at the Culbertson Elementary School ("Culbertson"), a division of the Marple Newtown School District. (Doc. No. 1 ¶ 2.1.) In October 2004, Wesley was in the kindergarten class at Culbertson, taught by Jaime Reilly. (*Id*. ¶ 3.2; Doc. No. 20 at 4.) As part of her kindergarten social studies curriculum, Reilly included a unit of study called "All About Me." (Doc. No. 20 at 3; Doc. No. 19 at 7.) The unit was designed to be a "socialization" program in which students would "identify individual interests and learn about others" and would "identify sources of conflict with others and ways that conflicts can be resolved." (Kindergarten Social Studies Curriculum, Doc. No. 20 at Ex. B.) Reilly implemented this unit of

study by featuring a different child each week.  (Doc. No. 20 at 4.)  During that week, the

children were given the opportunity to "share information about themselves" by bringing in a

"poster with pictures, drawings or magazine cut outs of [their] family, hobbies, or interests."

("All About Me" Handout, Doc. No. 20 at Ex. I.)  The children were also asked to bring in a

special toy or stuffed animal to introduce to the class and were permitted to bring a snack to

share with the class.  (*Id*.)  Finally, Reilly invited parents to participate in the unit by coming to

school to "share a talent, short game, small craft, or story" with the class.  (*Id*.)  Reilly asked that

parents contact her one week in advance to schedule a day and time for their presentations.[1]  (*Id*.)

Wesley responded to the "All About Me" week assignment in several ways.  He and his

mother together made a poster to bring to the class that was then displayed in the classroom

during his week.  (Doc. No. 19 at 15.)  Plaintiff let Wesley choose what to place on his poster; he

chose photographs of himself with his hamster, his brothers, and his parents, a picture of a

church cut out from construction paper, and a photograph of his best friend at the time.  (Busch

Dep. at 74.)  Plaintiff indicated that underneath the picture of the church, Wesley asked her to

write several words:  "'I love to go to the House of the Lord' or 'I like to go to church' or

---

[1]  There appears to be a dispute regarding how Plaintiff received information about this
unit of study.  Reilly attests that she gave the handout to parents during Back-to-School Night
and subsequently gave the handout to Plaintiff, who had not attended that night.  (Reilly Aff. at
1.)  Plaintiff indicated that it was possible that she had received some paperwork on the unit and
that she stopped by the school slightly more than one week before Wesley's "All About Me"
week to discuss what she should do with Reilly.  (Busch Dep. at 39, 60-61.)  Plaintiff attests that
Reilly then told her she could do "a favorite book . . . a dessert . . . just the different things on
this paper [the "All About Me" handout]."  (*Id*. at 61.)  Reilly testified that she had no
recollection of this meeting with Plaintiff.  (Reilly Dep. at 176.)  Defendants point out that while
Busch regularly signed in for visits to the school, there is no record of her signing in during the
month of October 2004 prior to Wesley's "All About Me" week.  (Doc. No. 19 at 14; *id*. at Ex.
7.)  While there is some dispute about how Plaintiff learned the details of the "All About Me"
week invitation, these facts are not material to the disposition of the instant motions.

something like that."  (Busch Dep. at 79.)  Plaintiff saw the poster hanging in the classroom

when she came in during Wesley's "All About Me" week.  (*Id.* at 81.)  Like the other children in

the class, Wesley was given the opportunity to present his poster to the class and explain the

various items on it.  (Reilly Dep. at 62.)

In addition to this poster, Wesley's mother also came to Culbertson to do a presentation

during his "All About Me" week.  On October 15, 2004, Plaintiff came to Wesley's class to

participate in his "All About Me" week by reading to the class.  (Doc. No. 19 at Ex. 7.)  In

preparing for this presentation, Plaintiff told Wesley that the teacher indicated that she could

come in and read his favorite book and asked what he would like her to read.  (Busch Dep. at

37.)  Wesley responded, "the Bible."[2]  (*Id.*)  Plaintiff describes herself as an Evangelical

Christian.  (Eric Busch Dep. at 41.)  Her husband described an Evangelical as "one who brings

God's word to the world."  (*Id.*)  Plaintiff testified that an Evangelical Christian is "someone

who believes . . . the bible is the literal word of God."  (Busch Dep. at 263.)  Busch and Wesley

routinely read the Bible together at breakfast and before going to bed.  (*Id.* at 94.)  Wesley often

carried the Bible with him and frequently asked his mother to read to him from the Bible.  (*Id.* at

93.)

The night before her visit, Plaintiff chose Psalm 118 from the Bible and decided to read

verses 1 through 4 and verse 14.  (*Id.* at 110, 114.)  The King James Bible, from which Plaintiff

planned to read (Busch Dep. at 226), translates those verses as follows:

---

[2]  Defendants note that Wesley's babysitter, Judy Harper, testified that Wesley's favorite book in kindergarten was "Brown Bear, Brown Bear."  (Doc. No. 19 at 16-17; Harper Dep. at 12.)  Defendants contend that the Bible is really Plaintiff's favorite book.  (Doc. No. 19 at 17; Busch Dep. at 95.)

1 Give thanks unto the Lord, for he is good; because his mercy
endures forever.
2 Let Israel now say, his mercy endures forever.
3 Let the house of Aaron now say, that his mercy endures forever.
4 Let them now that fear the Lord say,[3] that his mercy endures forever.
* * *
14 The Lord is my strength and my song, and is become my
salvation.

(Doc. No. 20 at 7 citing Psalms 118:1-4, 14 (King James).)  Plaintiff chose verses from Psalms

not only because she and Wesley frequently read from the Book of Psalms, but because she

thought the children in class would like Psalms since they are similar to poetry, and because she

wanted a reading that did not make any reference to Jesus, which she feared might upset some

people.[4]  (Busch Dep. at 111-13.)  Plaintiff testified that she intended to read the verses without

_____

[3]  Plaintiff's brief translates the first part of verse 4 as "Let them now hear the Lord say."
(Doc. No. 20 at 7.)  We assume this to be a typographical error as the King James version
translates the phrase as "Let them now that fear the Lord say . . . "

[4]  Defendants suggest that Plaintiff's choice of Psalm 118 was not so mundane as she
intimates.  Defendants cite to the expert witness report of Brian Ortale, who describes Psalm 118
as "a powerful tool for proselytizing by the Christian community."  (Doc. No. 19 at Ex. 41, p. 4.)
Ortale suggests that the Christian view of verse 22 ("the stone which the builders refused is
become the head stone of the corner") is that "Jesus is the stone rejected by some but exalted by
God."  (*Id.*)  As a result, verse 14 ("The Lord is my strength and my song, and is become my
salvation") is a reference to Jesus who is viewed as the Lord and the source of salvation.  (*Id.*)
Ortale also offers the opinion that Evangelical Christians believe the following:

[T]he work of the word is accomplished through the power of the word itself. . . .
God, as it were, uses the Evangelical Christian missionary as a mouthpiece to
speak the word but the power of the word is the power of God. . . .  An
Evangelical Christian believes the reading of the psalm conveys a blessing upon
the one who comes in the name of the Lord. . . .  The reading of Psalm 118
conveys the power of the word of God upon the reader, and the reader receives a
blessing for it.  This makes the reading of Psalm 118 a religious exercise for an
Evangelical Christian.

(*Id.* at Ex. 41, p. 7-8.)  Plaintiff does not comment on this opinion and its explanation of Psalm
118.  Clearly, there is some dispute as to the intention behind Plaintiff's desire to read Psalm 118

explanation and that if asked, she would respond that "it was ancient psalms and ancient poetry and one of Wesley's favorite things to hear and hopefully that would be the end of it and I could scoot out."[5]  (*Id.* at 115.)

On the morning of October 15, 2004, Plaintiff accompanied her son to school.  (Busch Dep. at 122.)  She entered Wesley's classroom and informed Reilly that she was prepared to read to the class from Psalm 118.  (*Id.* at 126-27.)  Reilly responded that she would have to check with the principal, Thomas Cook.  (*Id.* at 128.)  Reilly then spoke to Principal Cook in the hallway (*id.* at 131) and when she returned, told Plaintiff that Principal Cook wanted to speak with Busch in the hallway (*id.* at 135).  Once alone, Cook told Busch that reading the Bible to the class would be "against the law . . . of separation of church and state" (Busch Dep. at 139-40) and asked her to read from another book (Cook Dep. at 102).  Cook determined that it was improper to read from the Bible to a class of kindergarten students because he felt that the "Bible is holy scripture. . . .  [I]t's the word of God.  And . . . reading that to kindergarten students is promoting religion and it's proselytizing for promoting a specific religious point of view."[6]

_____

to Wesley's class.  However, as we will discuss hereinafter, our legal conclusions are not dependent on an assessment of Plaintiff's subjective intent but rather derive from a consideration of the context as a whole.

   [5]  Plaintiff also testified that she gave some consideration to the fact that the children to whom she was reading might ask questions involving religious belief.  (Busch Dep. at 264-65.)  When asked what she would do if that occurred, Plaintiff responded:  "You know, my intent was to just get in and read and leave.  Had they asked any questions, I didn't – I don't know what I would have done.  I probably would have, you know, maybe asked – just told them that it was just – I don't know what I would have done."  (*Id.* at 265.)

   [6]  Robert Mesaros, then Superintendent of the School District, supported Cook's response to Busch for the following reasons:

   In policy 220 it indicates that a student cannot – is not permitted to
   advocate a religious point of view or preference, and certainly a teacher is not

(Cook Dep. at 105-06.)  Busch responded that her other son had just finished reading a book

called *Gershon's Monster: A Story for the Jewish New Year* that he had taken from the school

library and suggested that it was "the same thing that [she] was going to read."  (Busch Dep. at

140.)  Principal Cook responded:  "Well, that's cultural and your son chose that book and these

children are not choosing to hear from the Bible. . . .  I can't let you do it."[7]  (*Id.*)  As a result of

this conversation, Busch returned to the classroom and asked Reilly for a different book to read

to the class.  (*Id.* at 153.)  Reilly offered Plaintiff a book about witches and Halloween, which

Plaintiff declined,[8] and they settled on a book on counting.  (*Id.* at 157-58.)

During Cook's conversation in the hallway with Busch, the door remained open.  (Reilly

Dep. at 183.)  Reilly spent that time taking attendance and gathering notes from the children.

---

permitted to read from the Bible to the students, and in this case the parent would
be taking the place of the teacher in front of a group of students who are there
because they must be there by state law, and they would be – a captive audience,
and they would have no choice but to listen to Mrs. Busch . . . read the Bible if so
permitted, and therefore it was assumed that the school district and the school was
advocating or supporting the – whatever was going to be read by, in this case,
Mrs. Busch.

(Mesaros Dep. at 158.)

[7]  Plaintiff's Counsel, as part of his deposition questioning on the distinction between
cultural and religious expression, asked Principal Cook and Ms. Reilly many questions that
sought their opinions on proposed hypothetical situations.  In particular, counsel asked questions
comparing a presentation on the menorah to one about "the history of the cross and Jesus
carrying the cross."  (*See, e.g.,* Cook Dep. at 92.)  Principal Cook drew a distinction between
cultural symbols and religious expression (*see, e.g., id.* at 107-17) while Reilly explained that
she could not answer the question without guessing because "that's not what happened in this
situation."  (Reilly Dep. at 101-02.)  As will be discussed *infra*, we cannot make legal findings
based on Defendnats' opinions offered in response to purely hypothetical scenarios.  As a result,
we use this deposition testimony only to illuminate the actual circumstances before us.

[8]  Busch did not recall the title of the book but did not want to read it because she did not
believe in the subject matter of the book.  (Busch Dep. at 158.)

(*Id.* at 182.)  She could not hear any of the conversation between Busch and Cook.  (*Id.* at 183.)
Reilly never spoke with Wesley about the incident nor did she notice any change in his behavior
or demeanor that day.  (*Id.* at 183-84.)

Like Plaintiff, many other parents participated in the "All About Me" unit by coming to
the class to read stories, share snacks, or do crafts.  (Doc. No. 19 at Exs. 6, 7.)  Among the
stories that parents read were:  *The Grinch Who Stole Christmas*, *The Jolly Roger*, and *Green
Eggs and Ham*.  (*Id.* at Ex. 7.)  Reilly also keeps a library of books in her classroom from which
she reads.  Among the books she read to Wesley's class, there are a number of books about
Christmas, Easter, and Hanukkah including:  *Bear Stays Up for Christmas*, *Froggy's Best
Christmas*, *The Wild Christmas*, *Ten Timid Ghosts on a Christmas Night*, *Christmas Trolls*, *The
Best Easter Eggs Ever*, *Easter Bunny's On His Way*, *The Night Before Easter*, *Hooray for
Hanukkah*, *The Magic Dreidels*, and *The Hanukkah Mice*.  (Doc. No. 19 at Ex. 5.)

In addition to parent participation in the "All About Me" unit, one parent came to
Reilly's class twice during the year to give presentations on Hanukkah and Passover.  Linda
Lipski, a parent of a child in Reilly's kindergarten class, offered to come to the class during the
week of Hanukkah.  (Reilly Dep. at 83-84.)  After discussing her presentation with Reilly several
weeks prior, Lipski brought in a menorah and a dreidel and read "a Blue's Clues Hanukkah
story."  (*Id.* at 84-86.)  Reilly consulted with Principal Cook about this visit only to make sure it
was okay, from a fire safety perspective, to light candles in the classroom.  (*Id.* at 90-93.)
Otherwise, Reilly indicated that she felt confident that the presentation would be appropriate:
"Because Mrs. Lipski and I had already discussed the guidelines ahead of time and considering
that Hanukkah is a part of our holiday Social Studies curriculum, I didn't feel – in my opinion I

didn't need to consult ahead of time with an administrator about that." (*Id.* at 93.)  Reilly also

noted that both the menorah and dreidel are symbols used on activity work sheets in the social

studies curriculum (*id.* at 95) and that there was a picture of a Christmas tree hanging in the

classroom (*id.* at 148).  She also discusses Christmas and Kwanza as part of the winter holiday

unit in the Social Studies curriculum.[9]  (*Id.* at 100.)  Later in the year, Lipski again offered to

come to the classroom, this time to present on the holiday of Passover.  (*Id.* at 117.)  Lipski's

Passover presentation consisted of the following:  "Mrs. Lipski came into the classroom on [a

specified date], she read *The Matzah Ball Fairy*[10] to the students and then offered the matzah ball

with chicken soup if they'd like to taste it."  (*Id.* at 121.)  Reilly set up the presentation by

discussing the spring holidays of Easter and Passover.

Marple Newtown School District has a policy regarding holiday observance in its

schools.  The policy expresses the following purpose:

> Our public schools represent a microcosm of society reflecting a pluralistic
> community enriched by diverse ethnic groups, religious [sic] and cultural
> heritage; positive resources to be respected and nurtured in education. . . .  The
> Board affirms the worth and dignity of each individual.  Sensitivity to each other
> is a critical component of the framework of the community.

(Doc. No. 19 at Ex. 10.)  The policy lists as its authority, the First Amendment to the

Constitution and the principle of "Separation of Church and State" and provides the following

---

[9]  When asked hypothetically whether she would allow a parent to come in and discuss the Christmas tree, Reilly responded:  "In my opinion, if I was teaching about the holiday of Christmas and I wanted to use – or a parent – if they came in and wanted to show that there was a Christmas tree – to the best of my knowledge [they] could show that as a symbol of the Christmas holiday in the classroom."  (Reilly Dep. at 149.)

[10]  Reilly recalled that the book *The Matz*ah *Ball Fairy* is about a "family [that] eats matzo balls[,] and they float because the matzo balls were light and fluffy."  (Reilly Dep. at 123-24.)

guidelines for principals regarding what is appropriate holiday observance in the schools:

1. Public schools should not be a forum (pupil or teacher) for expressing individual/personal religious preference/doctrine.
2. Religious symbols, cultural themes, etc., as a direct outgrowth of established curriculum, could be displayed together in a sensitively planned, centrally located cabinet. (No "crèche" or Nativity scene should be displayed on school property.)
3. A secular "holiday" tree without religious ornamentation in one central location, rather than individual classroom trees, would be an appropriate symbol of the season.
4. Secular "holiday" music, without religious content, is appropriate for all concerts, music classes, and classroom activities.
5. Parties, without religious theme or content, may be planned as a symbol of the season.

(*Id.*)  With respect to the "holiday tree," Principal Cook explained that teachers and students may call the tree a "Christmas tree" if they wish and noted that it was called a "holiday" tree in the School Board Policy but that he has "never told people they can't call it a Christmas tree." (Cook Dep. at 61, 67.)

On May 3, 2005, Plaintiff filed this lawsuit against Defendants Marple Newtown School District, Marple Newtown School District Board of Directors, Robert Mesaros, and Thomas Cook, stating claims under both the Federal and Pennsylvania Constitutions. The Complaint asserts the following six claims:  (1) violation of the Free Speech Clause of the United States Constitution; (2) violation of the Free Communication Clause of the Pennsylvania Constitution; (3) violation of the Establishment Clause of the United States Constitution; (4) violation of the Establishment Clause of the Pennsylvania Constitution; (5) violation of the Equal Protection Clause of the United States Constitution; and (6) violation of the guarantee of equal rights and prohibition on discrimination in the Pennsylvania Constitution.  (Doc. No. 1 at 9-13.)  Plaintiff seeks a declaratory judgment, actual and nominal damages, and litigation costs and attorney's

fees.  (*Id.* at 14.)  On February 23, 2006, Plaintiffs filed the instant Motion for Partial Summary Judgment, seeking judgment in their favor as to the liability of Defendants on all of the claims in the Complaint.  (Doc. No. 20.)  Defendants filed the Cross-Motion for Summary Judgment asserting that they were entitled to judgment in their favor on the above claims on the same day. (Doc. No. 19.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "The nonmoving party . . . 'cannot rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim."  *Townes v. City of Phila.*, Civ. A. No. 00-CV-138, 2001 U.S. Dist. LEXIS 6056, at *4 (E.D. Pa. May 11, 2001) (quoting *Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)).  Rather, the party opposing summary

judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, the court must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express*, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995). We do not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc*., 54 F.3d at 1127.

## III.   LEGAL ANALYSIS

### A.   Free Speech Claim

Plaintiff contends that in preventing her from reading a passage from the Bible to her son's kindergarten class, Defendants deprived her and her son, Wesley, of their rights to free speech.[11] We observe, at the outset, that this case raises some very perplexing questions of Constitutional law. As the Second Circuit noted in *Peck v. Baldwinsville Central School*, 426 F.3d 617 (2d Cir. 2005), the case before us "invites us to cut a path through the thorniest of constitutional thickets-among the tangled vines of public school curricula and student freedom of expression." *Id.* at 620. It is particularly difficult given the confusion both in the courts and in schools regarding the difference between appropriate cultural education and prohibited religious expression. *See Roberts v. Madigan*, 921 F.2d 1047, 1053 (10th Cir. 1990) ("Here, we face the

---

[11]  We note that Plaintiffs contend that Defendants' actions violated both Wesley's and Donna Busch's rights to free speech. Because it was Donna Busch who attempted to exercise her free speech rights in reading the Bible to Wesley's class, we assume that Plaintiffs intend to invoke Wesley's rights to free speech by virtue of the corollary "right to receive information and ideas." *Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). The Supreme Court has indicated that "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them" and that "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Id.* (emphasis in original).

difficulty of determining the proper balance between the freedom from religious coercion created

by state-sponsored religion and the inescapable reality that our culture is permeated by religious

symbols and rituals.  Nowhere has the proper line of demarcation been more difficult to define

than in our nation's public schools.").  We will approach this matter as we do all questions of

free speech rights, regardless of whether they implicate religious expression.[12]

1.     *Type of Forum*

The first step in any free speech analysis is to determine the type of forum at issue, a

determination that will dictate the level of scrutiny that must be applied to state actions that

restrict speech.[13]  *Peck*, 426 F.3d at 625.  The traditional public forum is the most "speech-

protective" in that "content-based restrictions will be upheld only if they are necessary to serve a

compelling state interest and are narrowly drawn to achieve that end."  *Peck*, 426 F.3d at 626

(quoting *Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004)).  Next

---

[12]   Defendants only briefly discuss free speech issues in their briefs, arguing instead that the courts have absolutely precluded bible reading in public schools.  (*See* Doc. No. 19 at 7-19.) Defendants rely on *School District of Abington Township v. Schempp*, 374 U.S. 203, 224 (1963), and the 1963 Pennsylvania Attorney General's Opinion, *Bible Reading in Public Schools*, 30 Pa. D. & C.2d 643, 647 (Pa. Dept. Just. 1963), to support their argument.  We note, however, that both *Schempp* and the Attorney General's Opinion address the issue of a school authority figure or classroom teacher reading the Bible as a mandatory exercise in the school and thus rest their findings on the Establishment Clause.  Because this case involves the more complicated problem of a student and/or parent seeking to read the Bible as part of a "show and tell"-type exercise, we must first address the issues through a free speech analysis and then through the Establishment Clause.

[13]   The free speech analysis under the Federal Constitution also applies to the free speech claim under the Pennsylvania Constitution.  *See Com., Bureau of Prof'l and Occupational Affairs v. State Bd. of Physical Therapy*, 728 A.2d 340, 343 (Pa. 1999) ("In analyzing a case such as the present one where the argument is based on Article I, § 7 of the Pennsylvania Constitution, we observe the same minimum standards of analysis and substantive protection as the Supreme Court of the United States has required under the federal constitution.").  As a result, this section applies to both of Plaintiffs' free speech claims (Counts I and II).

along the spectrum are "designated" and "limited" public fora.  A designated public forum is created when the state has opened for public discourse a place that is not traditionally open to public assembly.  *Id.*  In such a forum, the government may restrict speech only when it could have done so in a traditional public forum.  *Id.*  Similarly, a limited public forum is created when the state opens a non-public forum with some limits on the nature of the expressive activity.  *Id.*  Finally, a non-public forum is "neither traditionally open to public expression nor designated for such expression by the State."  *Id.*  The standards for limited and non-public fora are similar.  In both, the government can restrict speech—including the content of such speech—so long as the restrictions are reasonable and viewpoint neutral.  *Id.*

The incident in this case took place at an elementary school and, more particularly, in a kindergarten classroom.  As described above, the setting was a "show and tell"-type exercise in which parents were invited into the classroom to share a story, game, craft or snack as part of their children's "All About Me" week.  This was clearly not a public forum.[14]  The Supreme Court has held that "school facilities may be deemed to be public forums only if school authorities have by policy or by practice opened those facilities for indiscriminate use by the general public or by some segment of the public, such as student organizations."  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (internal citations and quotations omitted).  Here, Reilly, the kindergarten teacher, opened her classroom to specific people, the parents of her students, for a specific delineated purpose.  At most, the classroom became a limited public

---

[14]  Both parties agree with this premise.  Defendants argue this point in their Motion. (S*ee* Doc. No. 19 at 20-22 (arguing that the "All About Me" unit of study did not constitute a public forum in the kindergarten classroom).)  Plaintiffs do not quarrel with this notion.  (Doc. No. 23 at 3 ("Wesley Busch's classroom was not a public forum, and the school is afforded wide latitude in implementing the curriculum.").)

forum in which the state had the right to restrict the nature of the expressive activity.

      2.    *Level of Scrutiny in this Forum*

Whether Reilly's classroom during the "All About Me" unit was a limited or non-public forum, the same basic standard applies. While the government may restrict speech in these fora, such restrictions must still be reasonable and viewpoint neutral. *Peck*, 426 F.3d at 626. The initial question to be resolved is whether, in preventing Plaintiff from reading the Bible to Wesley's class, Defendants restricted the content or viewpoint of Busch's speech. "[D]rawing a precise line of demarcation between content discrimination, which is permissible in a non-public forum, and viewpoint discrimination, which traditionally has been prohibited even in non-public fora, is, to say the least, a problematic endeavor." *Id.* at 630. This problem is all the more difficult in the context of religious expression since "[i]t is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 831 (1995), *quoted in Peck*, 426 F.3d at 630.

Plaintiffs, relying on then-Judge Alito's dissent in *C.H. v. Oliva*, 226 F.3d 198 (3d Cir. 2000), argue that the school's action in preventing the Bible reading was viewpoint discrimination. Judge Alito commented generally that "discrimination based on the religious character of speech is viewpoint discrimination." *Id.* at 210 (Alito, J., dissenting). This contention was based on two Supreme Court cases: *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), and *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995). In *Lamb's Chapel*, the Court found prohibited viewpoint discrimination in a school's decision to permit use of school facilities by a variety of

14

groups while denying use of the property to a group wanting to address child-rearing issues from a Christian perspective. *Lamb's Chapel*, 508 U.S. at 393-94; *Oliva*, 226 F.3d at 211. Similarly, *Rosenberger* held that the university's refusal of student-activities funds to a religious student publication solely because of its religious perspective was likewise prohibited viewpoint discrimination. *Rosenberger*, 515 U.S. at 831; *Oliva*, 226 F.3d at 211. In both of these cases, the government action with which the Court took issue did not prevent speech that merely involved religion, but instead prevented speech because of its religious perspective. Because the restriction was based on the religious perspective of the group, such action is viewpoint discrimination. If, however, a school, seeking to promote the study of mathematics, offered funding to groups focused on mathematics and, in that context, denied funding to a group that studied religion, the conclusion would be different. Such action would constitute permissible content-based discrimination. Thus, the context of and intent behind the government action together with the nature of the speech inform the determination of whether the action amounts to content or viewpoint discrimination.

In this case, we agree with Plaintiff that the school's action constituted viewpoint discrimination. Plaintiff intended to read the Bible to the kindergarten class and not merely to talk about the Bible or its history as part of the social studies curriculum. The particular Biblical verses she intended to read certainly convey a religious perspective or viewpoint. For example, the very first verse she planned to read states: "Give thanks unto the Lord, for he is good; because his mercy endures forever." In addition, Principal Cook's explanation for his action indicates that he was motivated by a concern about the religious viewpoint of the material. He prohibited the Bible reading because it was "promoting religion and . . . proselytizing for

promoting a specific religious point of view." (Cook Dep. at 105-06.)  Moreover, Reilly, with Principal Cook's permission, had previously allowed discussions of Hanukkah, Christmas, Passover, and Easter in her classroom as part of the regular curriculum.  Clearly, the school did not preclude all speech that dealt in any way with religion but precluded speech in this situation because it expressed a religious viewpoint, which Principal Cook believed was inappropriate in the context of a kindergarten classroom.  We are satisfied that the school's action amounted to viewpoint discrimination.

> 3.    *Under What Circumstances is Viewpoint Discrimination Permitted?*

Plaintiffs' argument to the contrary notwithstanding, our conclusion that Defendants' action constituted viewpoint discrimination does not end the inquiry.  The restriction of Busch's speech in this case came in the context of a parent presenting to a kindergarten class, a context that is very relevant to the lawfulness of the school's action.  While viewpoint discrimination is generally not permissible even in a non-public forum, there are circumstances in which it may be allowed.

The circumstances under which viewpoint discrimination is permitted is a matter of disagreement among the Circuit Courts.  There is broad agreement that under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), private student expression may not be limited based on its viewpoint unless the school demonstrates a compelling interest such as the need to prevent substantial disorder or the invasion of the rights of others.  *Id.* at 511, 513; *see also Oliva*, 226 F.3d at 211-12 (Alito, J., dissenting).  However, the Court in *Hazelwood* appeared to take a different approach for speech that was school-sponsored or that "members of the public might reasonably perceive to bear the imprimatur of the school."  *Hazelwood*, 484

16

U.S. at 270-71 ("The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech.").  The *Hazelwood* Court held that:

> the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression.  Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

*Id.* at 272-73.  Circuit Courts have reached conflicting conclusions regarding the meaning of *Hazelwood*.  Several courts have concluded that viewpoint based decisions by educators are permissible in circumstances similar to those presented in *Hazelwood*, while others maintain that *Hazelwood* did not change the basic prohibition against viewpoint discrimination.[15]  We will address this question in light of Third Circuit authority, which is not definitive on the issue but provides sufficient guidance to make a determination.

_____

[15]  *See Peck*, 426 F.3d at 632 n.9 (First and Tenth Circuits allow viewpoint discrimination by schools; Ninth and Eleventh maintain general requirement of viewpoint neutrality; and Third Circuit held that a viewpoint restriction "may reasonably be related to legitimate pedagogical concerns" and therefore constitutional, but on a rehearing en banc, the circuit was equally-divided on this question) (citing *Ward v. Hickey*, 996 F.2d 448, 452 (1st Cir. 1993); *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 926-28 (10th Cir. 2002); *Planned Parenthood of S. Nev., Inc. v. Clark County Sch. Dist.*, 941 F.2d 817, 829 (9th Cir. 1991) (en banc); *Searcey v. Harris*, 888 F.2d 1314, 1319 n.7 (11th Cir. 1989); *C.H. ex rel. Z.H. v. Oliva*, 195 F.3d 167, 172 (3d Cir. 1999), *vacated and reh'g en banc granted by* 197 F.3d 63 (3d Cir. 1999), *on reh'g en banc* 226 F.3d 198 (3d Cir. 2000)).

In *Peck*, the Second Circuit concluded that "a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even* if reasonably related to legitimate pedagogical interests," *Peck*, 426 F.3d at 633 (emphasis in original), thereby agreeing with the Ninth and Eleventh Circuits.

17

Before addressing our interpretation of *Hazelwood*, we will first discuss why *Hazelwood* is clearly applicable to the case before us.  The Supreme Court made it clear in *Hazelwood* that speech that might be viewed as school-sponsored should be analyzed in its own category.  *Hazelwood*, 484 U.S. at 270-71.  The speech at issue in *Hazelwood* appeared in the student newspaper and thus bore the imprimatur of the school.  Similarly, this case presents a situation in which the students, here kindergartners, would likely view the speech at issue as school endorsed.  In *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), the Supreme Court noted that in determining whether there is a perception of government-endorsed speech, the focus must be on the effect of the speech or display on the listeners and viewers.  "The effect of the display depends upon the message that the government's practice communicates:  the question is what viewers may fairly understand to be the purpose of the display.  That inquiry, of necessity, turns upon the context in which the contested object appears."[16]  *Id.* at 595 (internal citations and quotations omitted).  Here, the

---

[16]  Justice O'Connor's observations with regard to the endorsement question are also instructive:

> The meaning of a statement to its audience depends both on the intention of the speaker and on the "objective" meaning of the statement in the community. . . .  If the audience is large, as it always is when government "speaks" by word or deed, some portion of the audience will inevitably receive a message determined by the "objective" content of the statement, and some portion will inevitably receive the intended message.  Examination of both the subjective and the objective components of the message communicated by a government action is therefore necessary to determine whether the action carries a forbidden meaning.

*Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring) (*quoted in Roberts*, 921 F.2d at 1057).  After citing Justice O'Connor's approach, the Tenth Circuit determined that in the context of a teacher who sought to silently read his Bible during class, "it is reasonable to conclude that not all of [the teacher]'s students would receive a purportedly secular message." *Roberts*, 921 F.2d at 1057.

context was a kindergarten classroom.  The speech at issue would have come from a parent,

typically seen as an authority figure by young children, standing at the front of the classroom to

present in place of the teacher and as part of the school curriculum.  This situation clearly creates

a perception of school-endorsed speech.[17]  *See Walz ex rel. Walz v. Egg Harbor Tp. Bd. of Educ.*,

342 F.3d 271, 277 (3d Cir. 2003) ("[I]n an elementary school classroom, the line between

school-endorsed speech and merely allowable speech is blurred. . . .  While secondary school

students are mature enough and are likely to understand that a school does not endorse or support

speech that it merely permits on a nondiscriminatory basis, kindergartners and first graders are

different."); *see also C.H. v. Oliva*, 990 F. Supp. 341, 354 (D.N.J. 1997), *aff'd*, 195 F.3d 167,

172 (3d Cir. 1999), *vacated and reh'g en banc granted by* 197 F.3d 63 (3d Cir. 1999), *aff'd by*

*an equally divided court on reh'g en banc*, 226 F.3d 198 (3d Cir. 2000) (noting in context of

student reading passage from Bible to his first grade classmates:  "If [student]'s teacher were to

praise him for completing his reading assignment skillfully, (i.e. by saying something like 'very

good'), it is not unlikely that a child in first grade could interpret that comment as an

endorsement of the story and the book."); *Peck*, 426 F.3d at 629 (finding application of

*Hazelwood* appropriate to speech in form of student's poster where it was "indisputably part of

the school curriculum . . . supervised by faculty members and designed to impart particular

---

[17]  Plaintiffs contend that it is "nonsense" to argue that "a parent carries a mantle of
authority that, in the minds of students, is indistinguishable from teachers."  (Doc. No. 20 at 19.)
Moreover, Plaintiffs assert that "to suggest that Wesley's classmates would confuse Wesley's
mother for a teacher, principal, or other school administrator does not fairly credit the perceptive
capabilities of five and six year-olds."  (*Id.*)  Plaintiff misses the point.  The concern is not that
the students will think that Wesley's mother is actually a teacher or school administrator, but
rather that a parent presenting to the class carries the same level of authority as does a teacher
and that in the context of a classroom, that authority creates the perception that the school
endorses the speech of the parent.

knowledge or skills to student participants and audiences"); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir. 2004) ("Few activities bear a school's 'imprimatur' and 'involve pedagogical interests,' more significantly than speech that occurs within a classroom setting as part of a school's curriculum."); *Roberts*, 921 F.2d at 1057 (affirming district court's view that teacher reading Bible to himself "communicated a message of endorsement of a religion to the impressionable ten-, eleven-, and twelve-year-old children in his class."). We are satisfied that *Hazelwood* clearly applies to the instant situation.

In addition, we are persuaded that the proper interpretation of *Hazelwood* suggests that in contexts where there is a likelihood of a perception of school-endorsed speech, the lower standard applies to a school's actions restricting that speech. Thus, schools may restrict speech even based on its viewpoint "so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 272-73. In reaching this conclusion, we are guided by recent Third Circuit cases that dealt explicitly with religious speech by elementary school students as part of classroom or educational activities. As noted above, the Third Circuit in *C.H. v. Oliva*, 195 F.3d 167 (3d Cir. 1999), originally endorsed this view of *Hazelwood*, permitting a school to prevent a student from reading the Bible to his first grade classmates. *Id.* at 172-73 ("Hazelwood clearly stands for the proposition that educators may impose non-viewpoint neutral restrictions on the content of student speech in school-sponsored expressive activities so long as those restrictions are reasonably related to legitimate pedagogical concerns."). However, this opinion was vacated, and a rehearing en banc was granted. 197 F.3d 63 (3d Cir. 1999). On rehearing, the court split evenly on the bible reading question, affirming the District Court without explication and dismissing a second claim about a religious-themed

poster on procedural grounds.  226 F.3d 198 (3d Cir. 2000).  Since such decisions have no

precedential value, *see Rutledge v. U.S.*, 517 U.S. 292, 304 (1996), the *Oliva* case leaves us with

little reliable guidance.

Nevertheless, in 2002, the Third Circuit addressed a similar question in *Walz ex rel. Walz*

*v. Egg Harbor Township Board of Education*, 342 F.3d 271 (3d Cir. 2003).  *Walz* dealt with two

instances in which an elementary school prevented a child from distributing religious-themed

gifts in the context of school holiday parties.  The parties were held in class, and the Parent

Teacher Organization ("PTO") encouraged parents to donate gifts that the PTO would then

distribute so as not to single out children who did not or could not bring presents.  *Id.* at 273.  In

the first instance, a student, in pre-kindergarten at the time, brought and tried to distribute pencils

with the imprint "Jesus [Loves] The Little Children" (heart symbol).  *Id.*  The teacher

confiscated the pencils, and the school superintendent determined that "the pencils could not be

distributed because the young children and their parents might perceive the message as being

endorsed by the school."  *Id.*  In the second instance, the student, now in kindergarten, sought to

distribute candy canes during the class holiday party that had a story called "A Candymaker's

Witness" attached.  *Id.* at 273-74.  The story described the candy cane as incorporating symbols

of the birth, ministry, and death of Jesus and concluded with a prayer that the candy cane be used

"to witness to The Wonder of Jesus and His Great Love that came down at Christmas and

remains the ultimate and dominant force in the universe today."  *Id.* at 274.  The school

responded that the student could hand out the candy canes before school, during recess, or after

school, but not during the classroom party.  *Id.*  The Third Circuit affirmed the District Court,

concluding that in both instances, the school's action was justified and did not violate the

student's First Amendment rights.  *Id.* at 280-81.  In reaching this conclusion, the Third Circuit emphasized the importance of the age of the children involved and the fact that "as a general matter, the younger the students, the more control a school may exercise."  *Id.* at 276.  The Court also noted that the risk that speech will be perceived as school-endorsed is heightened in an elementary school classroom.  *Id.* at 277.  The Third Circuit distinguished between "expression that symbolizes individual religious observance such as wearing a cross on a necklace, and expression that proselytizes a particular view."  *Id.* at 278-79.  Citing *Hazelwood*, the Court ultimately concluded that "[i]n the context of its classroom holiday parties, the school's restrictions on this expression were designed to prevent proselytizing speech that, if permitted, would be at cross-purposes with its educational goal and could appear to bear the school's seal of approval" and found such action to be appropriate given the school's "valid educational purpose."  *Id.* at 280-81.

Despite the fact that *Walz* does not explicitly endorse the original *Oliva* panel's view of *Hazelwood*, its language indicates that intention.  The case is particularly instructive for our purposes.  Not only do we read *Walz* as permitting viewpoint discrimination in limited circumstances when there is a valid educational purpose, we are also persuaded that *Walz* confirms that a school's intent to avoid endorsing proselytizing speech is one such valid purpose. Thus, a school's avoidance of an Establishment Clause violation, the perception that it promotes or endorses a religious viewpoint, is a legitimate interest that justifies viewpoint discrimination.

The instant case is remarkably similar.  Plaintiff's reading of the Bible to the kindergarten class could easily have been interpreted by the young students as endorsed by the school.  In addition, the principal's explicit intent was to prevent speech that proselytized or

promoted a specific religious viewpoint so as not to violate the Establishment Clause's

prohibition on state support and promotion of religion.  (*See* Busch Dep. at 139-40 (Cook told

Plaintiff she could not read the Bible because "it's against the law . . . of separation of church

and state . . .").)  The actual verses that Busch planned to read serve only to support Principal

Cook's concern.  For example, "Give thanks unto the Lord, for he is good; because his mercy

endures forever" indisputably communicates a religious message.  *Cf. County of Allegheny*, 492

U.S. at 598 (finding the phrase "Glory to God in the Highest!" in a banner over a crèche to be

"indisputably religious-indeed sectarian-just as it is when said in the Gospel or in a church

service").  Thus, the school acted appropriately in preventing the Bible reading because it was

justifiably concerned that the public school would be perceived as endorsing speech that

promoted a religious viewpoint, a violation of the Establishment Clause.

Plaintiff attempts to distinguish *Walz* by pointing to the *Walz* court's distinction between

speech that is invited by an activity where the school seeks students' personal views and speech

that is disruptive to the educational setting.  The *Walz* Court did make this distinction, noting:

> For a student in "show and tell" to pass around a Christmas ornament or a dreidel,
> and describe what the item means to him, may well be consistent with the
> activity's educational goals; likewise, a lesson that includes a mock debate invites
> individual student expression on the relevant topic.  In those scenarios, the
> student speaker is expressing himself in the context of a school assignment or
> activity where the school has sought students' personal views.

*Walz*, 342 F.3d at 278.  However, in the next sentence the court explained that "in the context of

an organized curricular activity, an elementary school may properly restrict student speech

promoting a specific message."  *Id.*  While Plaintiff is correct that the "All About Me" unit is

similar to a "show and tell" exercise, reading verses of the Bible to students is significantly

different than passing around an ornament and describing its personal meaning.  The "All About

23

Me" exercise certainly invited student expression and parent participation. Its goal was to help students learn about one another. It did not, however, call for students to express their specific religious views as would a mock debate that explicitly provides a context for such expression. Plaintiff could have responded to the assignment by speaking with the children about the importance of religion in their family life and describing the time she and Wesley spend reading the Bible and attending church. Such a presentation would have been responsive to the assignment and would not have promoted a specific message. The school had a valid educational purpose in preventing Plaintiff's reading of the Bible to a captive audience of kindergarten students. Under *Hazelwood*, the school's action was proper since it was reasonably related to legitimate pedagogical concerns.

4.      *The School's Action was Justified Even Under the Higher Standard*

Even if we were to conclude that *Hazelwood* does not permit viewpoint discrimination in the circumstances described, we would still find the school's action to be appropriate under the higher standard that requires a compelling interest to restrict speech based on its viewpoint. *See Oliva*, 226 F.3d at 211 (Alito, J., dissenting) ("[A] public school may even restrict speech based on viewpoint if it can show a compelling interest for doing so.").[18] While the Supreme Court has

---

[18]   We note that this case can be distinguished from Judge Alito's dissent in *Oliva*. In *Oliva*, Judge Alito commented on the school's action in taking down and re-posting in a less prominent location a poster depicting Jesus. The poster was made by a student in response to an assignment to make posters depicting what the students were "thankful for." *Oliva*, 226 F.3d at 201. Judge Alito found the school's action to be impermissible viewpoint discrimination after concluding that "a reasonable observer would not have viewed the exhibition of [the poster] along with the secular posters of his classmates as an effort by the school to endorse religion in general or Christianity in particular." *Id.* at 212. In contrast, Plaintiff's reading of Biblical verses to kindergarten students would certainly have been viewed as carrying such an endorsement.

24

not found a school's avoidance of an Establishment Clause violation to be a compelling interest in this context, it has left open that possibility.[19]  *See Widmar v. Vincent*, 454 U.S. 263, 271 (1981) (holding that "the interest of the University in complying with its constitutional obligations [avoiding violation of the Establishment Clause] may be characterized as compelling"); *see also Locke v. Davey*, 540 U.S. 712, 730 n.2 (2004) (Scalia, J., dissenting) ("a State has a compelling interest in not committing *actual* Establishment Clause violations" (emphasis in original)); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112-113 (2001) ("We have said that a state interest in avoiding an Establishment Clause violation "may be characterized as compelling," and therefore may justify content-based discrimination.  However, it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination.  We need not, however, confront the issue in this case, because we conclude that the school has no valid Establishment Clause interest.").[20]

We conclude that a school's avoidance of an Establishment Clause violation is a

---

[19]  In each of the cases in which the Supreme Court has spoken of avoiding Establishment Clause violations as a compelling interest, it has concluded that under the particular circumstances before it, the state's actions went beyond avoiding such a constitutional violation and that such actions did not constitute a compelling interest.

[20]  *Good News Club* is easily distinguishable from the instant case because the Court in *Good News Club* concluded that there was no reason to view the religious activity as school endorsed.  In that case, the school, relying on the Establishment Clause, had refused to allow a religious club to use its facilities.  However, because the club's meetings were held after school hours, were not sponsored by the school, and required parental permission to attend, there was no real concern that children would perceive school endorsement.  *Good News Club*, 533 U.S. at 112-18.  As a result, there was no real Establishment Clause problem.  In this case, the perception of school endorsement of a religious perspective was a justifiable concern given the fact that the speech at issue was to occur in the classroom as part of the curriculum and was to be presented by a parent to a captive audience of kindergarten students.  In this context, avoiding an Establishment Clause violation was certainly a compelling interest.

compelling interest such that it justifies viewpoint based restriction of speech.  In situations

where the school is called upon to permit or deny a student's religious expression, the rights of

the various parties are in conflict.  The student speaker certainly has a right to free speech, albeit

limited by the context of the school environment.  The student listeners, their parents, and all

other school community members have a right to be free from government promotion of religion.

In this context, the "right to freedom of speech . . . must yield to compelling public interests of

greater constitutional significance."  *Fink v. Bd. of Ed. of Warren County Sch. Dist.*, 442 A.2d

837, 842 (Pa. Commw. Ct. 1982).  The purposes behind the Establishment Clause are clear:

> The Establishment Clause . . . stands as an expression of principle on the part of
> the Founders of our Constitution that religion is too personal, too sacred, too holy,
> to permit its "unhallowed perversion" by a civil magistrate.  Another purpose of
> the Establishment Clause rested upon an awareness of the historical fact that
> governmentally established religions and religious persecutions go hand in hand.

*Engel v. Vitale*, 370 U.S. 421, 431-32 (1962).  The Supreme Court has made it clear that the

requirement of government neutrality towards religion does not, in any way, indicate a hostility

towards religion.  "It is neither sacrilegious nor antireligious to say that each separate

government in this country should stay out of the business of writing or sanctioning official

prayers and leave that purely religious function to the people themselves and to those the people

choose to look to for religious guidance."  *Id.* at 435.  These principles compel public schools to

be vigilant in avoiding promotion of religion or even the perception of school-endorsed

promotion.  Such action is undoubtedly a compelling state interest and certainly justifies

viewpoint based restrictions of speech when that speech may reasonably be seen as bearing the

imprimatur of the public school.[21]   Accordingly, we conclude that Defendants did not violate

Plaintiff's free speech rights in preventing her from reading the Bible to her son's kindergarten

class and are compelled to grant Defendants' Motion for Summary Judgment on this claim.

**B.      Establishment Clause Claim**

Plaintiffs also contend that Defendants' actions constituted a violation of the

Establishment Clause.[22]   Defendants argue that the opposite is true and that they took action

specifically to avoid such a violation.   Under the Establishment Clause of the First Amendment,

"Congress shall make no law respecting an establishment of religion . . ."  U.S. Const. amend.

I.[23]   The Supreme Court has made clear that this clause requires governmental neutrality vis-a-

vis religion in that "government should not prefer one religion to another, or religion to

---

[21]   Plaintiff argues that "allowing a child to express his love of the Bible – in an exercise designed to highlight *his* interests" cannot possibly be seen to advance one religion over another, or religion over non-religion.  (Doc. No. 20 at 18.)  However, there is a distinct difference between expressing one's love of the Bible and reading verses from it.  The former can be accomplished, without creating an Establishment Clause problem, by speaking about the Bible in a way that does not promote a religious viewpoint or carry the potential to offend those who do not similarly believe.  Reading verses from the Bible in the context of a kindergarten class, cannot be done without, at the very least, creating the perception of the school's promotion of religion.

[22]   The Pennsylvania Supreme Court has held that "the provisions of Article I, Section 3 of [the Pennsylvania] constitution do not exceed the limitations in the [F]irst [A]mendment's [E]stablishment [C]lause."  *Springfield Sch. Dist., Del. County v. Dep't of Ed.*, 397 A.2d 1154, 1170 (Pa. 1979) (citing *Wiest v. Mt. Lebanon Sch. Dist.*, 320 A.2d 362, 366, *cert. denied*, 419 U.S. 967 (1974)); *see also Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 764 (M.D. Pa. 2005). As a result, this section applies to both of Plaintiffs' Establishment Clause claims (Counts III and IV).

[23]  The Fourteenth Amendment imposes this limitation on the states and their political subdivisions.  *Modrovich v. Allegheny County, Pa.*, 385 F.3d 397, 400 (3d Cir. 2004) (citing *Wallace v. Jaffree*, 472 U.S. 38, 49-50 (1985)).

irreligion." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 703 (1994).

Claims of violations of the Establishment Clause are governed by the three-prong test set forth in

*Lemon v. Kurtzman*, 403 U.S. 602 (1971).  The *Lemon* test requires the following:  "First, the

[government action] must have a secular legislative purpose; second, its principal or primary

effect must be one that neither advances nor inhibits religion; finally, the [government action]

must not foster an excessive government entanglement with religion."  *Id.* at 612-13 (internal

citations and quotations omitted).

      Addressing the first prong, it is clear that the school's actions in preventing the reading of

the Bible to the kindergarten class had a secular purpose.  The only evidence relating to the

school district's motives indicates that the school acted in order to avoid violating the

Establishment Clause.  Plaintiff herself testified that Principal Cook told her she could not read

from the Bible because reading the Bible to the class would be "against the law . . . of separation

of church and state."  (Busch Dep. at 139-40.)  Cook explained (and then-Superintendent

Mesaros agreed) that he determined that it was improper to read from the Bible to a class of

kindergarten students because he felt that it would be improperly "promoting religion and . . .

proselytizing for promoting a specific religious point of view."  (Cook Dep. at 105-06.)  The

school's intention, to avoid an Establishment Clause violation by avoiding the perception of

school endorsement of a particular religious point of view, is inherently secular.  *See Roberts*,

921 F.2d at 1054 (affirming district court's finding that "the school district had a secular purpose

for its actions, namely, to assure that none of [teacher's] classroom materials or conduct violated

the Establishment Clause"); *see also Peck*, 426 F.2d at 634 ("While . . . avoidance of the

perception of religious endorsement [] is no doubt involved with religion, such a goal does not

bespeak an intent to inhibit religion itself.").[24]

The second prong, that the principal or primary effect of the action must not advance or inhibit religion, is also clearly met in this case.  This prong of the *Lemon* test "is not satisfied if official action, regardless of its purpose, 'conveys a message of endorsement or disapproval' of religion."  *Id.* at 1054-55 (quoting *Wallace v. Jaffree*, 472 U.S. at 56 n.42) (citing *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 389 (1985); *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984)).  Plaintiff contends that "allowing Wesley to share his love of the Bible would not have advanced religion over non-religion" and that "prohibiting Wesley's expression inhibited religion."  (Doc. No. 20 at 22.)  In fact, the school did not prevent Wesley or his mother from expressing their love of the Bible and their commitment to their religion.  Plaintiff did not seek to come to Wesley's class to tell the other students about her time with Wesley reading the Bible or the role of religion in their family life.  She sought instead to read verses from the Bible to the

---

[24]  Plaintiff argues that preventing proselytizing in the classroom is not a secular purpose and that Defendants' actual intent for *Lemon* purposes remains a question of fact.  (Doc. No. 20 at 22 n.9.)  On the first count, we disagree—preventing the promotion of a religious point of view in a context that would be perceived as school endorsed is certainly a secular purpose.

On the second count, Plaintiff does not fully describe what she deems to be the dispute of fact regarding the school's motivation.  There is no evidence that Principal Cook acted based on any motivation other than that of preventing the promotion of a religious viewpoint in the classroom.  Plaintiff's characterization of the school's actions as expressing a hostility to Christianity is merely a characterization, with no evidence to support it.  Furthermore, Wesley's ability to present his poster to the class and describe the significance of the picture of the church and the words "I love to go to the House of the Lord" or "I like to go to church" certainly undermines Plaintiff's unsupported allegation that the school's actions demonstrate a hostility towards Christian expression.  *See Peck*, 426 F.3d at 634 (noting that school's display of poster with church on it cuts against plaintiff's "bare allegation that the [School] District's actions were intended to demonstrate hostility toward religion.").

kindergarten students.[25]  As previously discussed, the likelihood that this activity would be perceived by such young students as a school endorsement of the Bible was significant.  Thus, the effect of the Bible reading, had the school allowed it, would, in fact, have violated the second prong of the *Lemon* test by "conveying a message of endorsement" of a particular religious belief.  On the other hand, the prevention of the Bible reading had a purely neutral effect.  In preventing Plaintiff's Bible reading, Principal Cook spoke with the teacher and then Plaintiff in the hallway, away from the children.  The students were not told that Plaintiff had planned a different reading.  Plaintiff requested and was given a new book to read to the class so that she could still participate in Wesley's "All About Me" week.  In sum, the school's actions did not have the effect of advancing or inhibiting religion but merely sought to avoid a constitutional violation.

Plaintiffs contend that in allowing Mrs. Lipski to speak to the class about Hanukkah and Passover but preventing Plaintiff from reading the Bible, the primary effect must have been to send a message of exclusion to Christians and Christian expression.  Plaintiffs add that the School District's policy, allowing a "holiday tree" without religious ornamentation, allowing religious symbols to be displayed together, and prohibiting a crèche or nativity scene further

---

[25]  Plaintiff also contends that the school invited Wesley and his mother to share an interest "so long as the interest did not pertain to religion" and in so doing "endorsed non-religion over religion."  (Doc. No. 20 at 23.)  This is not a proper characterization of the undisputed facts.  The school did not prevent Wesley from sharing any interest related to religion.  In fact, the school permitted him to share his poster with the class and describe why he had placed a picture of a church on that poster.  During the course of the year, the class discussed numerous holidays, including Christmas, Easter, Passover, Hanukkah, and Kwanza.  However, as will be explained in more detail *infra*, there is an important distinction between discussing religion and reading the Bible to young students in the classroom.  The school, justifiably, prevented only the latter.

excludes Christian expression.  Plaintiffs' argument "sweeps much too broadly" and fails to note the relevant distinctions at play.  *Roberts*, 921 F.2d at 1055.  The school allows discussions of religion, displays of religious symbols when placed together and sensitively planned, and discussions of cultural elements of religious celebrations.  It does not ban all Christian expression but rather seeks to ensure that the manner in which religion is raised in the school comports with the Establishment Clause in that it does not give the impression that the school is endorsing a particular religious point of view.  As the Tenth Circuit explained:

> [T]he Establishment Clause focuses on the manner of use to which materials are put; it does not focus on the content of the materials per se. . . .  It is neither wise nor necessary to require school officials to sterilize their classrooms and libraries of any materials with religious references in order to prevent teachers from inculcating specific religious values.  Instead, school officials must be allowed, within certain bounds, to exercise discretion in determining what materials or classroom practices are being used appropriately.

*Id.*  It is clear that Defendants' actions in preventing the Bible reading did not have the effect of advancing or inhibiting religion.

Finally, Defendants' actions satisfied the third prong in that they did not foster an excessive government entanglement with religion.  We observe that the mere request that Plaintiff not read from the Bible certainly did not, in and of itself, cause excessive entanglement with religion.  Its purpose and effect was to avoid just such a constitutional violation.  Plaintiffs contend that it is Defendants' lack of "a coherent policy governing parental participation in classroom activities or religious expression" and the resulting *ad hoc* decisions that cause excessive entanglement when the school as a government entity must scrutinize speech to determine "how much religion is too much."  (Doc. No. 20 at 26-27.)  We disagree with Plaintiff's characterizations of the school's actions in this regard.  The school is not seeking to

31

determine when the quantity of religious expression exceeds some benchmark, but rather it focuses on the type of expression, the context of that expression, and the way in which religious materials are used.  All of these guidelines are not only acceptable but required under the Establishment Clause.

Nevertheless, Plaintiffs are correct that decisions on religious expression tend to be made on an *ad hoc* basis.  Unfortunately, this results not from the school's lack of a clear policy, but instead from the fact-intensive nature of each inquiry and the somewhat confounding treatment of these questions by the courts.  While this opinion may provide some guidance to educators, we have no doubt that this area will remain confusing and will always require an individualized approach.  Educators in public schools are called upon to make difficult distinctions between permissible cultural or religious expression and impermissible religious promotion.  These decisions must be made based on the identity of the speaker, the context of the speech, the age of the listeners, and the way in which the religious content is delivered and likely to be heard.  No policy will prevent such fact intensive inquiries.  While it is unfortunate that each analysis must be so complicated, a school's effort to abide by the somewhat hazy requirements of the Establishment Clause does not, on its own, create excessive entanglement with religion.  Were that the case, every municipality or government agency would violate the Clause every time it made decisions about holiday decorations or funding for religious entities.  Government must be free to grapple with these questions without violating the Constitution by having the discussion.  Accordingly, we are compelled to conclude that the school satisfied the third prong of the *Lemon* test and did not, by its actions, violate the Establishment Clause of the First Amendment.  We will grant Defendants' Motion for Summary Judgment on this claim.

### C.    Equal Protection Claim

Plaintiff argues, in addition to her Free Speech and Establishment Clause claims, that Defendants also denied her and Wesley equal protection of the laws.[26]  Plaintiff contends that in allowing other parents and students of non-Christian faiths to share religious traditions during classroom activities, Defendants subjected her and her son to disparate treatment in violation of the Fourteenth Amendment.  While Plaintiff does not point to specific instances of disparate treatment and instead incorporates her entire brief by reference, we assume the equal protection claim to be focused on Mrs. Lipski's two presentations to the class about Hanukkah and Passover respectively.  If these presentations were permitted, Plaintiff argues, Busch's reading of the Bible should have been allowed as well.[27]  Defendants counter that no other parent

--------------------------------------------

[26]  Pennsylvania courts evaluate equal protection claims under the Pennsylvania Constitution, Pa. Const., Art. I, §§ 1, 26, under the same standards applicable to equal protection claims under the Fourteenth Amendment to the Federal Constitution.  *Asian-American Licensed Beverage Ass'n v. Commonwealth of Pennsylvania*, No. Civ. A. 05-CV-2135, 2005 WL 3077246, at *4 n.3 (M.D. Pa. Nov. 3, 2005) (citing *Harrisburg v. Zogby*, 828 A.2d 1079, 1088 (Pa. 2003) ("[T]he meaning and purpose of the Equal Protection Clause of the United States Constitution and the State's prohibition against special laws, are sufficiently similar to warrant like treatment, and contentions concerning the two provisions should be reviewed simultaneously") (citations omitted)).  As a result, this section applies to both of Plaintiffs' equal protection claims (Counts V and VI).

[27]  In addition, throughout their brief, Plaintiffs make reference to the School Board Policy that allowed some religious symbols to be displayed sensitively together but prohibited a crèche or nativity scene.  Plaintiffs have pointed out that symbols of Hanukkah, including a menorah and dreidel, were used on activity sheets but the school's policy allowed only a "holiday" tree with secular ornaments to be placed in a central location in the school.  Principal Cook made clear that teachers and students were free to refer to the tree as a Christmas tree if they so desired.  In addition, Reilly displayed a picture of a Christmas tree in her classroom and read numerous stories with Christmas and Hanukkah themes to her class.
     While we do not view these examples as the basis of an equal protection claim (both because they have not been sufficiently developed in the record and because the school appears to display both Hanukkah and Christmas symbols), we note that it is simply ludicrous to refer to the Christmas tree as a "holiday" tree.  The school and, as will be discussed *infra,* the Supreme

presentations during "All About Me" week involved religious expression.  However, this fact is irrelevant to the equal protection determination.  Whether or not the parents of other faiths presented to the class as part of the same curricular program is not determinative, and Defendants' contention views the issue through too narrow a lense.  Nevertheless, we are not persuaded that Defendants' actions throughout the course of the year in allowing some parent presentations but not others violated the Equal Protection Clause.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).[28]  Thus, the first question in this analysis must focus on whether the

_____

Court of the United States consider the Christmas tree to be a secular symbol of the Christmas holiday.  If the school makes the choice to display it, it should justify that choice based on applicable law but should not try to avoid it by masking its choice in secular language.

[28]  The Seventh Circuit has commented that in terms of discrimination between religious groups, the First Amendment provides the primary source of protection while the equal protection clause merely demands that such distinctions not be arbitrary.  *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988) ("This is not because discrimination between religions is deemed on a constitutional par with those purely 'economic' discriminations that the equal protection clause, in modern interpretations, treats so leniently, but because the religious dimension of the discrimination is governed by the religion clauses of the First Amendment, leaving for the equal protection clause only a claim of arbitrariness unrelated to the character of the activity allegedly discriminated against.").

Clearly, a state law granting a denominational preference without a compelling interest would violate the Establishment Clause.  *See Larson v. Valente*, 456 U.S. 228, 246 (1982) ("The First Amendment mandates government neutrality between religion and religion. . . .  In short, when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." (internal citations and quotations omitted)).

school's actions dealt with similarly situated people.  In the circumstances presented by this case, we are compelled to conclude that they did not.

When questioned about why the teacher and principal permitted Mrs. Lipski's presentations but would not permit Busch's Bible reading, Principal Cook made it clear that he viewed those presentations as acceptable discussions of Jewish culture within the context of the curriculum.  (Cook Dep. at 91, 93-94 ("I think that when the menorah was presented it was presented in a way which was related to the curriculum in terms of its importance historically and culturally.").)  The Supreme Court has made clear that it is impermissible for the government to celebrate Christmas or any other holiday as a religious holiday because that would be government endorsement of a particular religious point of view.  *See County of Allegheny*, 492 U.S. at 611 ("If the government celebrates Christmas as a religious holiday . . . it means that the government really is declaring Jesus to be the Messiah, a specifically Christian belief.").  However, government may celebrate a holiday associated with one religion if it is "confin[ed] . . . to the holiday's secular aspects."  *Id.*  In *County of Allegheny*, the Court concluded that it was impermissible to place a crèche with a banner stating "Glory to God in the Highest!" in the main part of the county courthouse because in doing so "the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the crèche's religious message."  *Id.* at 600.  The Court also noted that a display of a menorah may present "a closer constitutional question" because "the menorah's message is not exclusively religious.  The menorah is the primary visual symbol for a holiday that, like Christmas, has both religious and secular dimensions."  *Id.* at 613-14.  Similarly, the Court commented that "[a]lthough Christmas trees once carried religious connotations, today they typify the secular

celebration of Christmas."  *Id.* at 616.  Thus, in reaching the conclusion that the crèche display at issue violated the Establishment Clause whereas the menorah and Christmas tree display did not, the Court made a subtle but important distinction that educators in public schools must regularly make.  Based on the "unique circumstances" involved in each instance, the Court concluded that some displays can be permissible cultural representations while others carry an impermissible message of government endorsement of religion.  *See id.* at 595, 621;[29] *see also Bible Reading in Pub. Sch.*, 30 Pa. D. &. C.2d 643, 649 (recognizing the difference between teaching about religion and the teaching of religion).

The same is true of the distinctions made by Defendants in this case.  While Plaintiffs contend that Defendants committed an equal protection violation, they offer no evidence to suggest that the presentations by Mrs. Lipski to the kindergarten class were anything but secular, cultural lessons about the holidays.  While it is true that both Hanukkah and Passover are Jewish holidays, the presentations themselves did not in any way promote a religious viewpoint.  For Hanukkah, Mrs. Lipski brought in a menorah and dreidel to show the class and read a story from the "Blue's Clues Hanukkah" book.  Similarly, for Passover, Mrs. Lipski brought in matzah ball soup for the children to taste if they wished and read *The Matzah Ball Fairy*, a fanciful children's story about a food typically eaten on that holiday.  The Hanukkah presentation was permitted as part of the social studies curriculum in which Reilly discussed the holidays of Christmas, Hanukkah, and Kwanza.  Similarly, Reilly set up the presentation on Passover by discussing the

---

[29]  The *County of Allegheny* Court also noted that its view of the menorah as a secular symbol could be altered were it presented in a different context.  *County of Allegheny*, 492 U.S. at 621 n.70 ("[N]othing in this opinion forecloses the possibility that on other facts a menorah display could constitute an impermissible endorsement of religion.").

spring holidays of Easter and Passover.  In each instance, the context of the presentation made it clear that the information was being presented to the students as part of their education on various religions and cultures.  In contrast, Plaintiff's intended Bible reading had none of these elements.  As part of a "show and tell"-type exercise and without explanation or context, Plaintiff sought to read verses from the Bible to the kindergarten class.  Rather than teaching about religion, such an exercise could easily be perceived as being an endorsement of religion. While it is subtle, this distinction is all-important.  Mrs. Lipski and Plaintiff were not similarly situated because their presentations differed in content, form, and context in ways that justifiably impacted the school's decision in each case.  As a result, the different treatment each received did not give rise to an equal protection violation.[30]  Accordingly, we are compelled to grant Defendants' Motion for Summary Judgment on this claim as well.

An appropriate Order follows.

---

[30]  We note again that the deposition testimony of Principal Cook and Reilly included numerous questions regarding hypothetical situations that asked these witnesses to determine whether they would permit certain presentations on religious topics and if not, how those presentations differed from others that were permitted.  While we have considered the testimony on these topics, we will not make legal determinations based on witness's opinions in response to hypothetical questions.  We decide the equal protection claim based only on the actual occurrences in this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONNA KAY BUSCH, in her    :
individual capacity and as the    :
parent and next friend of Wesley    :
Busch, a minor,    :
          :      CIVIL ACTION
      v.          :
          :      NO. 05-CV-2094
MARPLE NEWTOWN SCHOOL    :
DISTRICT, ET AL.    :

**<u>ORDER</u>**

AND NOW, this <u>31st</u> day of May, 2007, upon consideration of Plaintiff Donna Kay

Busch's Motion For Partial Summary Judgment (Doc. No. 20), Defendants Marple Newtown

School District, Marple Newtown School District Board of Directors, Robert Mesaros, and

Thomas Cook's Cross-Motion For Summary Judgment (Doc. No. 19), and all papers submitted

in support thereof and in opposition thereto, it is ORDERED as follows:

     1.      Plaintiff's Motion for Summary Judgment (Doc. No. 20) is DENIED.

     2.      Defendants' Motion for Summary Judgment (Doc. No. 19) is GRANTED.

     3.      Judgment is entered in favor of Defendants and against Plaintiffs.

IT IS SO ORDERED.


                         BY THE COURT:


                         _____
                         R. Barclay Surrick, Judge